UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REBEKAH GRAHAM, | : | |
| Plaintiff | : | |
| v. | : | No. 5:16-cv-03676 |
| HENDRIX-ISA, LLC and HENDRIX GENETICS, | : | |
| Defendants | : | |

# **O P I N I O N**

**Defendants' Motion for Summary Judgment – Granted in Part and Denied in Part**

**Joseph F. Leeson, Jr.**                                                                                            **June 13, 2017**
**United States District Judge**

## I.   Introduction

Rebekah Graham claims that her former employer, Hendrix-ISA LLC, demoted her because of her gender and a recent pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, and the Pennsylvania Human Relations Act.

Hendrix-ISA has moved for summary judgment. It contends that Graham's pregnancy was too temporally remote from the decisions it made about her employment for her to make out a prima facie claim of pregnancy discrimination and that Graham has not presented any evidence to support an inference of gender-based discrimination. Hendrix-ISA also contends that even if Graham can make out a prima facie claim of pregnancy - or gender - based discrimination, she has failed to present sufficient evidence for a jury to conclude that the legitimate reasons that it has offered for its employment decisions were just a pretext to discriminate against her.

Hendrix-ISA is correct with respect to Graham's claim of gender-based discrimination, but Graham has presented sufficient evidence for a jury to find in her favor on her claim of pregnancy-based discrimination.

## II.   Background

Hendrix-ISA is in the business of supplying "layer chickens" to egg producers in the United States. The company was formed in January 2015 from assets acquired from three existing companies: Penn Embryo, Inc. and Pennovo, Inc., both located in Pennsylvania, and Midwest Farms, LLC, located in Virginia. At the time of the acquisition, Graham was working for Penn Embryo, having been hired in 2007 as the company's office manager. By the time of

the acquisition, she was serving as both the office manager and the company's human resources administrator.

After the acquisition was complete, Hendrix-ISA extended Graham a formal offer of employment with the newly created company. Her offer letter, dated January 16, 2015, informed her that "[a]t this time, your job title, responsibilities and rate of pay . . . will remain consistent with your current responsibilities" but cautioned that "[j]ob titles and responsibilities, along with wages and hours worked[,] will be reviewed and are subject to change in accordance with federal and state law." Graham Dep. Ex. P-3, ECF No. 33-7. Graham accepted.

A few weeks later, on February 16, 2015, Graham started her maternity leave. She delivered her baby two days later. Her maternity leave lasted for approximately three months, and she returned to the office on May 13.

Prior to her maternity leave, Graham's responsibilities included tracking the hours that employees worked, assisting with the company's payroll, keeping employee records up to date, tracking employees' vacation time, and assisting with the administration of employees' retirement plans and insurance benefits. She was also responsible for fielding human resources questions at her site, and, according to Graham, she was told by the head of Hendrix-ISA that she was "going to be the human resources liaison for the company in all locations." Graham Dep. 90:11-13, ECF No. 33-6. She also claims that during those first few weeks with Hendrix-ISA, the head of the company described Graham, Graham's counterpart in Virginia (the office manager at the legacy Midwest Farms site), and himself as "the dream team." *Id.* at 92:11-14.

But according to Graham, all was not well. She testified that before she started her maternity leave, either the head of the company or its director of operations—she couldn't recall which—told her that she "was going on maternity leave at the wrong time." *Id.* at 98:7-14. When she returned, her duties had been narrowed to only assisting with the administration of the company's health insurance plans. In her view, she had been "stripped . . . of [the] responsibilities" she had before her maternity leave. *Id.* at 51:3-4. The company's explanation, according to its director of finance, was that it needed Graham to focus her attention on the company's health insurance plans because those plans were set to expire, and the company needed to select a new provider and enroll all of its employees to avoid any lapses in coverage. O'Aku Dep. 198:17-199:20, ECF Nos. 33-11 to -12. In his view, this was a full-time task, and a "very, very important" one at that. *Id.* at 199:30-200:8.

Meanwhile, the other duties that Graham had been performing prior to her maternity leave had been assigned to another employee, Cathlyn Weidman. *Id.* at 106:22-107:9. Weidman had been an employee of both Penn Embryo and Pennovo prior to the Hendrix-ISA acquisition, and, like Graham, she was offered a position with Hendrix-ISA after the acquisition. Weidman was originally hired by Penn Embryo in 2010 as an office assistant, around the same time that Graham took on the role of Penn Embryo's human resources administrator. According to Graham, Weidman was hired as her "extra set of hands" to help Graham manage the additional duties she would be assuming as human resources administrator. Graham Dep. 14:1-8. Later, in

2

2012, when Penn Embryo's owner founded Pennovo, Weidman was tapped to be Pennovo's office manager. Weidman served in both of those capacities—office assistant at Penn Embryo, and office manager at Pennovo—until the time of the Hendrix-ISA acquisition.

On May 18—five days after Graham returned from her maternity leave—the head of Hendrix-ISA sent a letter to the members of the administrative team at both the Pennsylvania and Virginia locations, explaining that the company was planning a reorganization to further integrate the operations of the three legacy companies that Hendrix-ISA had acquired:

> [P]art of our success strategy is building a new management team which is now in place; second is integrating the companies we acquired into the one company we have now become; this involves reorganization or restructuring. . . . This is not an easy undertaking; the restructuring process will require difficult decisions that will impact some of our team members. Changes will include out-sourcing as well as some position eliminations and changes to individual roles and responsibilities. . . . We have great team members and we value each and every one of them and truly wish we could keep all of our talents, but business realities require hard choices.

Graham Dep. Ex. P-15, ECF No. 33-7. A little over a month later, on June 30, Graham received an email from the company's director of operations, informing her that the company had posted a set of restructured positions to an online employment site and advising her to apply to the positions that interested her. On July 10, the company's director of finance formally announced to the company that the finance departments at both the Pennsylvania and Virginia sites had been restructured, and that, going forward, they would consist of three positions at each site: an office manager/executive assistant, an office assistant/receptionist, and an accounts payable/receivable clerk. Ultimately, the head of Hendrix-ISA's parent company nixed Hendrix-ISA's plan to have three finance employees at each site, so the office assistant/receptionist position was merged with the accounts payable/receivable clerk position (creating what Hendrix-ISA refers to as the "office assistant/AP/AR position").

Graham and Weidman were both considered for both positions at the Pennsylvania site. In the end, the company offered Weidman the office manager/executive assistant position and offered Graham the office assistant/AP/AR position. According to the company, it chose Weidman for the office manager position because the company's directors of finance and operations believed that she was most qualified. The director of operations claims that he placed particular weight on the fact that Weidman had been serving as the office manager for Pennovo prior to the Hendrix-ISA acquisition because Pennovo, which was in the business of operating a chicken hatchery, was closer to the market segment that Hendrix-ISA planned to target than Penn Embryo, where Graham served as the office manager, which was involved in the egg vaccination business. He also pointed to the fact that Weidman had approximately a decade of experience supervising other employees in her role as the manager of a travel plaza. As for the

3

director of finance, he claims that he chose Weidman because he had worked with her "consistently" during his time with the company and felt that her "skill set [was] consistent with what [he had] in mind for that position." O'Aku Dep. 117:23-118:6.

Graham ultimately turned down the office assistant position that she was offered. The position would have paid $38,000 per year—a substantial departure from her existing salary of approximately $54,000 per year, and not enough, in Graham's view, for her to support her family. As a result of that decision, her employment with Hendrix-ISA ended. By contrast, the office manager position offered to Weidman paid approximately $50,000—approximately the amount that Graham had been earning.[1]

Graham claims that Hendrix-ISA's explanation for its decision to, in effect, swap her and Weidman's roles was attributable to discrimination against her as a result of her pregnancy and on the basis of her gender, in violation of Title VII, as amended by the Pregnancy Discrimination Act, and the Pennsylvania Human Relations Act.[2] In her view, the selection of Weidman—her former assistant—over her for the office manager position simply made official the de facto demotion she had received when she returned from maternity leave.

Hendrix-ISA contends that Graham cannot make out a prima facie claim of discrimination under either theory. With respect to her claim of pregnancy discrimination, Hendrix-ISA argues that Graham was no longer "affected by pregnancy, childbirth, or related medical conditions," *see* 42 U.S.C. § 2000e(k), when it decided, nearly six months after she gave birth to her child, to offer her the office assistant position instead of the office manager position. With respect to her claim of gender discrimination, Hendrix-ISA argues that Graham has not produced sufficient evidence to give rise to an inference of any gender-based discrimination.

Hendrix-ISA also argues that if even Graham can make out a prima facie claim under one of her two theories, she has not presented sufficient evidence for a jury to conclude that the reasons it has articulated for bestowing the officer manager position on Weidman instead of her were merely a pretext to cover discriminatory animus.

In addition to these merits-based disputes, the parties also disagree over whether Graham may be able to impose liability on any of Hendrix-ISA's parent companies, which Graham has identified in her pleadings only as "Hendrix Genetics."

### III. Standard of Review – Summary Judgment

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the

---

[1] *See* Mumm Dep. 71:18-23, ECF No. 33-8.
[2] Graham also raised a claim under the Fair Labor Standards Act, claims under Pennsylvania law for violations of The Minimum Wage Act of 1968 and the Wage Payment and Collection Law, and a claim in restitution under Pennsylvania common law, all of which concerned work she had allegedly done for Hendrix-ISA during her maternity leave that went uncompensated. In her brief in opposition to Hendrix-ISA's motion, Graham states that the parties have settled those claims. Accordingly, those claims will be dismissed with prejudice. *See* E.D. Pa. Local R. Civ. P. 41.1(b).

governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

**IV.    Graham has presented sufficient evidence for a jury to find in her favor on her claim of pregnancy discrimination.**

*A.    A jury could find that Graham has established a prima facie claim.*

Title VII prohibits an employer from discriminating against an individual "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). In 1978, Congress passed the Pregnancy Discrimination Act, which amended Title VII to clarify that the prohibition against discrimination on the basis of sex includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The Act also makes clear that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." *Id.*

To make out a prima facie claim of pregnancy discrimination, Graham must show that she was pregnant, that Hendrix-ISA knew about her pregnancy, that she was qualified for her job, and that there was "some nexus between her pregnancy and [an] adverse employment action" that she suffered. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008).

In Hendrix-ISA's view, Graham cannot establish that nexus between her pregnancy, in February 2015, and its decision, in July 2015, to offer the office manager position to Weidman instead of her because the two were too temporally remote. But that argument turns a blind eye to the events that led up to that decision. When the facts are read in the light most favorable to Graham—as they must at this stage—the decision to choose Weidman over her for the office manager position was not an isolated event that occurred months after her pregnancy, but rather could be viewed by a jury as the culmination of an arc of discrimination that started before she left on maternity leave.

As mentioned, Graham testified that shortly before she started her leave, she was told, either by the head of the company or by its director of operations (the latter of whom was one of the two people who made the decision to offer the office manager position to Weidman instead of Graham), that her leave was coming "at the wrong time."[3] A rational jury could infer that the

---

[3]    The fact that Graham cannot recall precisely which person made this comment to her could cast doubt on the veracity of her claim, but at this stage, it is not the function of the Court to weigh her credibility as a witness.

company (or at least some of its top managers) harbored animus toward Graham for the fact that her pregnancy coincided with a key time in the young company's life—as the company itself puts it, Graham's pregnancy came at a time when the company was "only four weeks old and undergoing significant changes in transitioning from three separate entities into one company." Defs.' Mem. 17-18. Then, while she was on her leave, her responsibilities were transferred to Weidman. That alone is not indicative of discrimination—after all, someone needed to cover her duties during her absence—but when Graham returned, nearly all of those duties remained with Weidman. Less than two months later, the company elected to make Weidman its office manager—in effect making permanent the transfer of Graham's role to Weidman. That Hendrix-ISA would wait until then to formally elevate Weidman is readily explainable, because, according to the company, it had been planning since at least March to undertake a restructuring of its finance and administrative staff.[4] It is not difficult to conceive that the company would simply wait until then to make official the de facto transfer of Graham's position to Weidman, when it would be able to offer a Graham a purported reason for its decision. *See Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (concluding that a jury could find a causal link between an employee's pregnancy and her termination one year later in light of evidence that suggested that an employee motivated by animus may have "bided his time" until an opportune moment).

Making out a prima facie claim of employment discrimination is "a burden easily met," *C.A.R.S.*, 527 F.3d at 365 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), and when viewed in a light most favorable to Graham, a rational jury could infer that there was "some nexus" between these events, *see id.*

### B.     *A jury could conclude that Hendrix-ISA's explanation is pretextual.*

Once an employee is able to establish a prima facie claim of discrimination, "then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination." *Id.* at 364. To do so, the employee must either cast doubt on the believability of the employer's explanation, or point to evidence suggesting that discrimination was nonetheless "more likely than not a motivating or determinative cause." *Id.* at 370.

Hendrix-ISA contends that no rational jury could conclude that its reasons for selecting Weidman over Graham for the office manager position were pretextual. As mentioned, the company claims that its directors of finance and operations concluded, as part of a restructuring of the duties of its administrative and finance departments, that Weidman was more qualified than Graham for the office manager/executive assistant position at the Pennsylvania site. Its

---

[4]     March is when the company hired its director of finance, who testified that he was hired with a "mandate" to build an in-house finance department, which would include a review of the two existing administrative personnel at both the Pennsylvania and Virginia sites. *See* O'Aku Dep. 48:1-22.

director of operations cited to Weidman's experience with Pennovo's chicken hatchery business and past experience managing a travel plaza, and its director of finance cited to his belief, after working with Weidman, that her skill set was consistent with his expectations for the position.

Graham's primary response to that is to contend that the entire restructuring process that Hendrix-ISA claims that it undertook for its administrative and finance departments in Pennsylvania and Virginia was a pretext to cover its discrimination against her—a "sham reorganization," in her words.

In the Court's view, no rational jury could agree. The undisputed evidence shows that in May 2015, the head of Hendrix-ISA sent an email to the current members of its administrative team at both the Pennsylvania and Virginia sites, informing them that the company would be undertaking a restructuring process. Then, approximately one month later, the company publicly posted three job positions—the office manager/executive assistant position, the office assistant/receptionist position, and the accounts payable/receivable clerk—on Monster.com, a site that connects job seekers with open positions. The following month, Graham and Weidman were both interviewed for the restructured positions at the Pennsylvania site (which, as mentioned, had by then been reduced to two, the office manager/executive assistant position and the office assistant/AP/AR position), and the company extended offers at its Pennsylvania and Virginia sites for the two positions at each site. For a jury to agree with Graham, it would have to conclude that over a number of months, Hendrix-ISA publicly posted job openings and re-interviewed four of its employees at two different sites solely as a charade to cover its desire to demote her because of her pregnancy.[5] No rational jury could make that finding on this record.[6]

But Graham does not need to establish that the entire restructuring was a pretext to prevail on her claim. All Graham must do is cast sufficient doubt on the company's explanation for choosing to elevate Weidman, and demote her, so as to permit a jury to infer that the company's decision may have been motivated by an improper criterion. And Graham has pointed to enough evidence for a rational jury to reach that more modest conclusion.

---

[5]     At Graham's deposition, the following exchange on this topic took place:

> Q:  So Hendrix went through the process of restructuring the entire team in both Virginia, and affecting those employees in Virginia, and affecting the employees in [Pennsylvania], because you were pregnant?
>
> A.   Yes. It seems like a big waste, which is why it took me a while to believe it. But yes.

Graham Dep. 96:24-97:5.

[6]     Graham makes a number of observations about the reorganization that, in her view, raise suspicions about its legitimacy, but they cannot bear the weight she places on them. She points out that the reorganization was announced to the administrative staff within a week of her return from maternity leave, that it was not formally documented, and that it affected only two employees at each site. She also highlights the fact that Hendrix-ISA's parent company vetoed its plan to expand the staff from two employees to three, which she appears to view as evidence that the company did not have authority to restructure its staff, though she does not explain how limitations on the company's authority to expand its headcount would also mean that the company could not reevaluate its existing personnel or modify their roles. Even in a light most favorable to Graham, these and the other observations she makes about the restructuring process would not permit a jury to conclude that Hendrix-ISA went through this process solely to create a cover story to conceal its discrimination against her.

As mentioned, Hendrix-ISA claims that its directors of finance and operations viewed Weidman as the more qualified of the two, but Graham has pointed to evidence casting some doubt on the notion that her former assistant was more qualified for Graham's role than she was. She observes that Penn Embryo, whose office she managed, employed between twenty-five to thirty employees prior to the acquisition, while Pennovo, whose office Weidman managed, employed only four. She also points out that Weidman did not have any experience handling employee benefit matters prior to being hired in 2010 to assist Graham and that Pennovo had to retain Graham for three months as a consultant to bring the company's bookkeeping, payroll, and taxes up-to-date and teach Weidman how to properly perform those tasks. That evidence casts doubt on the claims of Hendrix-ISA's directors that Weidman's experience and skill set made her more suitable than Graham for the role.[7]

That evidence must also be considered alongside the evidence discussed in connection with her prima facie claim that is suggestive of a nexus between her pregnancy and the company's decision to choose Weidman over her. *See C.A.R.S.*, 527 F.3d at 370 (recognizing that "evidence supporting the *prima facie* case is often helpful in the pretext stage"). When the doubts she has raised about Hendrix-ISA's explanation are combined with that evidence—that she was told that her pregnancy had come at the wrong time, that many of her responsibilities were never returned to her after her maternity leave, and that less than two months later, she was effectively demoted—a rational jury could infer that her pregnancy may have been at least a motivating factor.

That is not to say that Graham has presented an overwhelming case. It may well be that Weidman was chosen for the office manager role simply because she had worked closely with Hendrix-ISA's director of operations for a number of years prior to the acquisition (he had been a partner of Pennovo prior to the acquisition, where Weidman had worked as the office manager), and he preferred to work with her in that role going forward, even at the cost of some disparity in experience between her and Graham (Title VII, it must be remembered, "does not require fairness," *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 297 (3d Cir. 1997)). Or it may be that the company valued Weidman's experience with Pennovo's hatchery business enough to outweigh the fact that Graham seemed to have more experience in an office manager role. But Graham has produced enough evidence for a jury to make that determination.

---

[7] Graham also points to the fact that some Hendrix-ISA employees were not properly enrolled in health insurance while she was on maternity leave—a responsibility that fell on Weidman during Graham's absence—but Graham admitted that she had made a similar mistake in the past with another employee. Graham also points out that she too had previous experience in the chicken hatchery business because Penn Embryo had started a hatchery of its own prior to the Hendrix-ISA acquisition, but Penn Embryo's hatchery did not commence operations until November 2014—only two months before the Hendrix-ISA acquisition.

## V.   Graham has not presented sufficient evidence to make out a prima facie claim of gender discrimination.

In addition to her claim of pregnancy discrimination, Graham also claims that she was discriminated against based on her status as a "female caregiver of a newborn baby." As Graham recognizes, this is a so-called sex-plus claim—a claim that Hendrix-ISA discriminated against her not because of her gender, standing alone, but because of her status as part of a certain subclass of her gender. *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009) (explaining that a sex-plus claim contends that an "employer does not discriminate against the class of men or women as a whole but rather treats differently a subclass of men or women" (quoting 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 456 (3d ed 1996)).

Because "parental status . . . is not a protected characteristic under Title VII," *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 412 n.16 (E.D. Pa.), *aff'd*, 587 F. App'x 731 (3d Cir. 2014), the ultimate question, "regardless of the label given to the claim, . . . is whether the employer took an adverse employment action *at least in part* because of an employee's sex." *Chadwick*, 561 F.3d at 43; *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004) ("The term 'sex plus' or 'gender plus' is . . . a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against."). The common formation of the type of sex-plus claim that Graham has raised arises when "an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities." *Chadwick*, 561 F.3d at 44-45.

As with her claim for pregnancy discrimination, to make out a prima facie claim of gender discrimination Graham must point to evidence showing a nexus between the decision not to offer her the office manager position and her status as a member of a protected class. The record in this case, however, is devoid of evidence from which a jury could infer any link between the two.

Graham points to the fact that, prior to the Hendrix-ISA acquisition (and during the first few weeks after the acquisition, before her maternity leave), her and Weidman's hours at Penn Embryo were generally from 8:00 a.m. to 3:00 p.m., but that after she returned from her maternity leave, she was told by the location manager of the Pennsylvania site that "regular hours were between 8:00 and 4:30 and 5:00." Graham Dep. 55:5-7. Graham characterizes that as the company "scrutinizing [her] hours," Pl.'s Br. 34, but she does not suggest that she was being held to a different standard than any of Hendrix-ISA's other employees or that this requirement was linked to any animus directed toward her because of her caregiving responsibilities. *Cf. Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1155, 1160 (8th Cir. 2003) (finding evidence that a supervisor had refused a young mother's request to leave work at 4:30 p.m. instead of 5:00 to pick up her child from daycare, despite the fact that other employees in similar

9

roles "left work at 3:45 on a regular basis," to be probative of discrimination). Quite the opposite: Graham testified that she informed the company that she needed to leave by 4:45 p.m. each day to pick up her child, and according to Graham, the company "seemed to accommodate it." Graham Dep. 59:19-60:6. She also testified that she offered to make herself available to stay later than 4:45 p.m., provided that she was given advance notice so that she could make arrangements for her child's care, but she "was never asked to stay late when [she] returned from [her] maternity leave." *Id.* at 59:10-18.

Graham also testified at her deposition that this same location manager had been "questioning [her] schedule" and "wasn't satisfied with [her] having to leave early for all of these doctors['] appointments," but she went on to explain that his concerns related to medical appointments for her and her family that Graham had scheduled prior to her return from maternity leave, when she had thought that her work schedule would still be from 8:00 a.m. to 3:00 p.m., and he had simply "asked [her] if [she] could reschedule the appointments." *Id.* at 52:17-53:8. She testified that she was not disciplined for the time she missed, and she ultimately ended up providing the location manager with a summary of her medical appointments so that he would know in advance when she would need to miss time from work. She also noted that this manager had "no problem with [her] . . . leaving early for a couple of [her older daughter's] away [softball] games," and that "he was a softball dad himself." *Id.* at 53:1-3.[8]

This evidence is not sufficient for a jury to find a nexus between the decision to offer the office manager job to Weidman and Graham's status as a mother of a young child—particularly because Graham does not suggest that this location manager played a role in the decision-making process. Bolstering that conclusion is the fact that Weidman herself is the mother of a young child, who was seven years old at the time Weidman was offered the office manager position. While it is not inconceivable that an employer could hold stereotypical views about mothers of newborns while not holding the same views about mothers of second-graders, Graham has not produced evidence sufficient to give rise to such an inference in this case.

Because no reasonable jury could find that Graham has made out a prima facie claim of gender discrimination, summary judgment is warranted in Hendrix-ISA's favor on this claim.

## VI. Graham cannot impose liability on any of Hendrix-ISA's parent companies.

In addition to their disputes about the merits of Graham's claims, the parties also dispute whether Graham may be able to impose liability on any of Hendrix-ISA's parent companies.

Hendrix-ISA LLC is owned by two entities: Hendrix Genetics USA LLC, which owns 51% of the company, and Hatchery Partners, a joint venture that owns the other 49%. Hendrix

---

[8] In her brief, Graham also alluded to Weidman "tracking [her] attendance" and bringing her attendance records to the attention of the company's director of finance, but her brief offers no more detail than that, and the paragraphs in her statement of material facts that her brief cites to for support contain no reference to these allegations. *See* Pl.'s Br. 35; Pl.'s Counter-Statement of Material Facts ¶¶ 179-183, ECF No. 37-1; *see also* Fed. R. Civ. P. 56(c)(3) (providing that a party must "cit[e] to particular parts of materials in the record" to support its factual assertions and that "[t]he court need consider only the cited materials").

Genetics USA LLC, in turn, is wholly owned by Hendrix Genetics LLC, which itself is wholly owned by Hendrix Genetics B.V. *See* Mumm Dep. 8:9-14:5; Mumm Dep. Ex. 1. Hendrix Genetics LLC—the layer directly below Hendrix Genetics B.V.—is a relative newcomer, having been formed in mid-2016 as a holding company for Hendrix Genetics B.V.'s United States-based businesses.

In her original complaint and her two amended complaints that followed, Graham named two defendants: Hendrix-ISA LLC—her direct employer—and "Hendrix Genetics." Waivers of service were executed by both Hendrix-ISA LLC and Hendrix Genetics LLC. *See* ECF No. 5.

Defendants contend that Graham cannot establish liability against any of Hendrix-ISA's parents, both because she has not properly named any of them in her pleadings and because she has not established an evidentiary basis for any of them to be held liable for the discrimination she claims to have suffered.

From Graham's response to Defendants' motion, it is not entirely clear which of these entities she seeks to hold liable, and on what grounds. She makes reference to the fact that Hendrix Genetics B.V.—the ultimate parent—exercised some control over Hendrix-ISA's operations, such as requiring its sign-off on decisions related to manager- or director-level personnel, vetoing Hendrix-ISA's plan to expand the headcount of its administrative and finance staff as part of the restructuring process, and requiring monthly reports on Hendrix-ISA's finances. She also makes reference to the fact that the director of human resources at Hendrix Genetics, Research, Technology and Services, B.V.—yet another entity, which appears to be a wholly owned subsidiary of Hendrix Genetics B.V.—had some input on Hendrix-ISA's human resource operations in January and February 2015, as Hendrix-ISA was starting up its operations. In summary, Graham writes that "[w]hether Hendrix Genetics LLC (USA)/Hendrix Genetics LLC and/or Hendrix Genetics B.V. are [her] employers is a factual contention that is in dispute," and so "Hendrix Genetics"—the entity she named in her complaint—"should not be dismissed." Pl.'s Br. 38.

To the extent that Graham was using the reference in her complaint to "Hendrix Genetics" as a placeholder until she was able to determine which entity to sue (which appears to be the case), the time for her to amend her complaint to replace that placeholder with a properly-named defendant has passed. The use of fictitious parties "is permissible in certain situations until reasonable discovery permits the true defendants to be identified," but [i]f reasonable discovery does not unveil the proper identities, . . . the [fictitious parties] must be dismissed." *Blakeslee v. Clinton Cty.*, 336 F. App'x 248, 250 (3d Cir. 2009) (concluding that a district court did not abuse its discretion for dismissing, *sua sponte*, a series of fictitious parties at the summary judgment stage). Here, discovery closed nearly four months ago, and Graham has not

sought to amend her complaint to name any of the various Hendrix entities she mentions in her brief as parties to this suit.[9]

More fundamentally, Graham has not pointed to a sufficient factual basis to impose liability on any of these entities. There are two scenarios under which separate entities can each be deemed to be a plaintiff's employer and thus subject to liability for employment discrimination. The first, referred to as single employer liability, is when "two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982). Whether there is "functional integration of operations," "centralized control of labor relations," "common management," and "common ownership" are all relevant considerations, but the determination "ultimately depends on all the circumstances of the case and is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'" *Id.* (quoting *Local 627, Int'l Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040, 1045-46 (D.C. Cir. 1975), *aff'd sub nom. S. Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800 (1976)).

The second, referred to as joint employer liability, occurs "when two entities exercise significant control over the same employees." *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997). Relevant considerations to determining whether an entity may be deemed to be an employer under this theory include "the entity's 'authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours,'" "its 'day-to-day supervision of employees, including employee discipline,'" and "its 'control of employee records, including payroll, insurance, taxes and the like.'" *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204-05 (3d Cir. 2014).

It is not clear which of the two theories Graham is invoking. Given that she is focusing on various Hendrix entities under the Hendrix Genetics B.V. umbrella, it would seem that she is suggesting that they should be liable as a single enterprise, but she couches this portion of her brief in terms of whether some or all of these entities may be a "joint employer" along with Hendrix-ISA. *See* Pl.'s Br. 35-38. In any event, Graham has not pointed to facts that would suffice to establish liability on any of these entities under either theory. The fact that the ultimate parent, Hendrix Genetics B.V., wished to be consulted about decisions Hendrix-ISA made about its manager- and director-level personnel, exercised some degree of control over the company's headcount, and reviewed its financials on a monthly basis does not establish a substantial "degree of unity between the entities with respect to ownership, management (both directors and

---

[9] Because Hendrix Genetics LLC executed a service waiver, that entity could be viewed as a proper party to this suit. After all, Graham did identify "Hendrix Genetics" as a defendant in her pleadings, and her omission of the entity's LLC designation could simply be viewed as a technical error in the caption, which could be easily remedied. *See Battle v. Anderson*, 993 F.2d 1551, 1993 WL 152672, at *2 (10th Cir. 1993) (unpublished table opinion) (recognizing that a "defective caption is merely [a] formal error and should never be viewed as [a] fatal defect"). But, as will be seen, Graham has not supplied an evidentiary basis to impose liability on this or any other Hendrix parent entity, so, to the extent it is a proper party, it is entitled to summary judgment.

officers), and business functions," *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 87 (3d Cir. 2003), or rise to the level of a "functional integration of [their] operations," sufficient to collapse them (along with Hendrix Genetics LLC and Hendrix Genetics USA LLC) into a single enterprise. Nor does it amount to the type of day-to-day supervision over Hendrix-ISA's affairs needed to view Hendrix Genetics B.V. as her joint employer.

## VII. Conclusion

The Court concludes that a rational jury could potentially find in Graham's favor on her claim of pregnancy discrimination, so Hendrix-ISA's motion for summary judgment on that claim is denied. But Graham has not presented sufficient evidence to state a prima facie claim of gender discrimination, so summary judgment is warranted in Hendrix-ISA's favor on that claim.

Finally, with discovery having ended and Graham having failed to seek leave to amend her complaint to replace her reference to "Hendrix Genetics" with a properly identified party—and with no sufficient evidentiary basis appearing for Graham to impose liability on any of Hendrix-ISA's parent companies—her claims against "Hendrix Genetics" are dismissed.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge